JACKSON HILL COAL AND COKE COMPANY *v.* MER-
CHANTS HEAT AND LIGHT COMPANY.

[No..23,734.  Filed June 29, 1923.]

1. APPEAL.—*Review.—Record.—Absence of Evidence.—Granting
New Trial.*—On appeal from a judgment on the second trial
of a cause, assigning as error the granting of a new trial after
the first trial, the ruling cannot be reviewed in the absence of
the evidence adduced at the first trial, especially where the
motion for a new trial on which the new trial was granted
assigned as causes therefor the insufficiency of the evidence
to sustain the verdict, the giving and refusing of certain in-
structions, and the admission and exclusion of certain evidence.
p. 428.

2. NEW TRIAL.—*Granting of.—Effect of.*—The granting of a new
trial has the effect of expunging the record of the first trial
and restoring the case to its original condition before the trial,
and further proceedings are to be *de novo.*  p. 428.

Jackson Hill, etc., Co. *v.* Merchants Heat, etc., Co.—193 Ind. 422.

3. CONTRACTS.—*Construction.—Evidence.—Parol.*—In the construction of contracts, the intention of the parties is always important, and, for the purpose of determining such intent, the court may consider the conditions and surroundings of the parties at the time of entering into the contract and the objects they had in view, and if these are not stated in the contract, they may be shown by parol.  p. 429.

4. CONTRACTS.—*Sales.—Certainty.—Mutuality.*—A contract between a coal operator and consumer whereby the operator agreed to furnish the consumer's entire requirement for a certain period at stipulated prices is not void for uncertainty. p. 431.

5. TRIAL.—*Instructions.—Burden of Proof.*—Where the defendant had filed a counterclaim, to which the plaintiff filed two affirmative paragraphs of answer and a general denial, an instruction which referred to each of plaintiff's affirmative pleadings, and told the jury that the burden of proof was on plaintiff to prove the material allegations of each paragraph thereof, and of each paragraph of its answer to the counterclaim, was not strictly accurate, but not likely to mislead the jury.  p. 434.

6. SALES.—*Coal.—Apportionment Among Customers.—Instructions.*—In an action by a coal operator for a balance due for coal sold to defendant, wherein defendant filed a counterclaim for damages for failure of plaintiff to deliver to defendant its proportionate share of the output of plaintiff's mines, an instruction which told the jury that it was the duty of plaintiff to so apportion its entire output as to give all contract customers substantially the same proportion of the quantity of coal contracted for, was not erroneous, though it appeared that plaintiff had used many tons·of coal under its own boilers in the operation of its mines, and had furnished the state and federal governments more than 30,000 tons, on orders, the filling of which was not within its discretion or control.  p. 434.

7. APPEAL.—*Instructions.—Harmless Error.*—On appeal, an instruction on a specific issue, though possibly erroneous, will be held to be harmless error, where the verdict indicated that such issue had been determined in favor of appellant.  p. 435.

8. SALES.—*Written Contract.—Supplemental Verbal Contract.— Instruction.*—In an action by a coal operator for a balance due for coal sold to defendant under a written contract, wherein defendant filed a paragraph of answer averring that, during a certain period of the operation of the contract, it purchased from the plaintiff, and fully paid for, a large quantity of coal, at an advanced price, to fill the place of coal which plaintiff

did not deliver in accordance with the contract of sale, an instruction that the written contract existing between the parties would not interfere with their making a valid and binding verbal agreement for such outside purchases, "unless it was induced by fraud or false representations on the part of the plaintiff," was not erroneous as injecting the issue of fraud without its being pleaded, where the evidence fairly tended to establish that plaintiff had made false representations concerning the amount of coal which could reasonably be apportioned to the defendant under the written contract. p. 436.

9. TRIAL.—*Instruction.*—*Estoppel.*—In an action for a balance due for coal sold and delivered, an instruction that certain enumerated acts of the defendant would not operate to estop it from asserting that the plaintiff had charged excessive prices for a large quantity of the coal delivered was not objectionable as invading the province of the jury. p. 438.

10. SALES.—*Coal.*—*Nondelivery.*—*Purchase to Supply Deficiency.* —*Instruction.*—In an action by a coal operator for a balance due for coal sold and delivered to defendant, wherein defendant filed a paragraph of answer averring that, during a certain period of the operation of the contract, it purchased from the plaintiff, and fully paid for, a large quantity of coal, at an advanced price, to fill the place of coal which plaintiff did not deliver in accordance with the contract of sale, instructions were not erroneous as permitting defendant to recover on the basis of its alleged loss in making up its entire requirements from purchases outside the contract, instead of limiting such basis to the quantities of coal so purchased to make up the amount to which the defendant would have been entitled under a fair apportionment under the provisions of the contract. p. 438.

11. SALES.—*Coal.*—*Nondelivery.*—*Purchase to Supply Deficiency.* —*Instruction.*—In an action by a coal operator for a balance due for coal sold and delivered to defendant under a written contract, wherein the defendant filed a counterclaim for damages for plaintiff's failure to deliver the proportionate part of its entire output to which defendant was entitled under the contract, where the defendant purchased additional coal on the market to supply the deficiency caused by the failure of plaintiff to furnish coal under and in accordance with the contract, an instruction that if the jury found the facts as alleged, the defendant would be entitled to recover on its counterclaim "the difference between what the coal which should have been delivered under the contract would have cost at the contract price and the actual cost of the coal purchased in

good faith for use in place of what the seller failed to deliver," was not erroneous. p. 438.

12. APPEAL.—*Review.*—*Exclusion of Evidence.*—*Instruction.*—In an action by a coal operator for a balance due for coal sold and delivered to defendant during the war period of 1917 and 1918, wherein defendant filed a counterclaim for overcharges of the price of the coal delivered, made by the plaintiff and paid by the defendant, the exclusion of the President's proclamation of October 27, 1917, authorizing an increased price of 45 cents per ton at the mine was harmless error where evidence of such increased cost, based on demands of the miners, was admitted, and the verdict indicated that the plaintiff got the benefit of that increase, nor was it error to give an instruction to the effect that such proclamation did not change the relation of the parties to the written contract. p. 441.

From Marion Circuit Court (30,506) ; *Louis B. Ewbank,* Judge.

Action by the Jackson Hill Coal and Coke Company against the Merchants Heat and Light Company, wherein defendant filed a counterclaim. From a judgment for the defendant on its counterclaim, the plaintiff appeals. *Affirmed.*

*F. Winter, Hays & Hays* and *Miller & Dowling,* for appellant.

*J. W. Fesler, Harvey J. Elam* and *Howard S. Young,* for appellee.

MYERS, J.—Appellant, a coal operator, brought this action against appellee, a consumer, to recover for coal sold and delivered by it to appellee under an alleged written and oral contract. The leading issues were formed by a complaint in two paragraphs, a supplemental complaint, and various paragraphs of answer. There was also a set-off and counter-claim on the part of appellee, wherein it claimed overcharges for coal furnished by appellant. Moreover, that appellant had failed to perform its contract to furnish appellee its coal requirements, and had failed to deliver to appellee

its fair proportion of coal on an equitable distribution of appellant's production between its contract customers, and demanded a substantial judgment. The necessary replies and additional answers were filed, completing the issues, which were submitted to a jury for trial, resulting in a verdict and judgment in favor of appellee on its counterclaim in the sum of $58,000, and against appellant on its complaint. From this judgment appellant perfected an appeal to this court, and has assigned as errors the overruling of its motion to strike out certain interrogatories submitted to it by appellee, the sustaining of appellee's motion for a new trial, and the overruling of its motion for a new trial.

This appeal is from a judgment rendered upon the verdict of a jury upon a second trial of this cause. The first trial resulted in a verdict in favor of appellant, but, on appellee's motion, it was set aside and a new trial granted. This ruling will be the first to receive attention.

Each of the pleadings in this case asking affirmative relief was predicated upon a written contract which, omitting the signatures, reads as follows:

"THE JACKSON HILL COAL AND COKE COMPANY, OF TERRE HAUTE, INDIANA, agrees to sell, and THE MERCHANTS' HEAT AND LIGHT COMPANY OF INDIANAPOLIS, INDIANA, agrees to buy, the following grade of coal at the prices and upon the terms herein below set forth:

"QUANTITY: Entire requirements.
"GRADE: Regulation 1-1/4" screenings and run of mine coal. From Jackson Hill Mines known as No. 2, No. 4, No. 5, No. 6.
"QUALITY: Screenings shall contain not less than 11,500 B. T. U. Dry;
Run-of-Mine shall contain not less than 12,000 B. T. U. Dry.

"PRICE:   Screenings, $.85 per net ton.
Mine Run, $1.10 per net ton.
Prices F. O. B. Cars Mines.

"PERCENTAGE   SCREENINGS:   The · seller agrees to furnish not less than seventy (70) per cent. screenings yearly.
If Run-of-Mine coal is furnished in excess of 30% of the yearly requirements, same shall be invoiced and paid for at $1.00 per net ton F. O. B. mines.

"ROUTE:   As ordered.

"PAYMENTS:   All coal shipped to be paid for on the twentieth of the month following shipment.

"IN EFFECT FROM April 1, 1916, to April 1, 1918.

"EQUIPMENT:   Drop bottom cars wherever possible.

"REMARKS:   Jackson Hill Coal and Coke Company will specify on postal notice, from which mine the coal is shipped.

"Actual mine weights shall govern settlements.

"This contract is made subject to strikes, combinations of miners or laborers, lockouts, accidents and causes beyond the control of either party to this contract.

"The buyer and seller, in entering into this contract, realize the uncertainties of deliveries, due to strikes, casualties and causes beyond the control of either party, and it is expressly agreed that the intent of this contract is not to make either party liable for any failure to perform due to matters beyond the control of the party in default, but that the material shall be shipped by the seller and accepted by the buyer pursuant to the terms hereof, so far as physical conditions and labor conditions at the respective plants and the services rendered by common carriers will permit.

"And it is further understood and agreed that, in the event the buyer fails to comply with the terms and conditions of payment, or neglects to order or refuses to receive coal as specified herein, the seller may cancel this agreement, and shall not therefore be liable for any claims of damage of any nature whatsoever.

"(Signed in duplicate.)"

That part of the record pertaining exclusively to the first trial shows only the submission of the cause for trial, instructions given by the court, the instructions tendered by both plaintiff and defendant and the court's disposition thereof, the verdict of the jury, the defendant's motion for a new trial, containing all the grounds, legal and discretionary, usually assigned in motions of this character, being eighteen in number, and the court's ruling thereon, setting aside the verdict and ordering a new trial. Appellant fails to refer us to that part of the record upon which it relies to sustain its contention in this particular. It merely asserts generally that the first verdict was set aside on the theory that the jury misconstrued the written contract and disregarded the court's instructions. Furthermore, that the jury found that the deliveries to appellee had been reduced by causes beyond its control, and that it had made a fair apportionment of the coal among its contract customers. From anything appearing, these assertions are mere inferences drawn by appellant from the instructions given by the court and from the general verdict of the jury in its favor. Such a presentation must be disregarded for indefiniteness. The motion in question called for the opinion of the trial court as to the sufficiency of the evidence to sustain the verdict, a reconsideration of its rulings in giving and in refusing to give certain instructions, and in admitting and in refusing to admit certain evidence. Some of these questions, if not all, depend for their answer upon the evidence, which is not here. The ruling on the motion was general and hence we have no means of determining the particular cause or causes embraced in the motion which induced the court to sustain it. The granting of the new trial had the effect of expunging the record of the first trial and for further proceedings *de novo*. *Compton* v. *Ben-*

*ham* (1908), 44 Ind. App. 51, 61; 20 R. C. L. pp. 313, 317, §§97, 101.

After a careful examination of the record and briefs of counsel, we have reached the conclusion that many of the questions presented by this appeal have their inception in the different views of the contract. Appellant insists that the contract should be construed as one for screenings only, with the privilege to appellant of furnishing mine run; but, in case it furnished more than thirty per cent. of appellee's yearly requirements in mine run, such overplus was to be at the rate of $1.00 per ton, instead of $1.10 per ton. On the other hand, appellee contends that, under this contract, appellant obligated itself to furnish from certain of its mines, and appellee agreed to take from appellant, its entire coal requirements—screenings and mine run or both, preferably screenings—necessary in the operation of its business for the period therein named. It may be here noticed that the parties hereto, as we understand them, practically agree that this contract was entered into upon the basis of appellant's yearly production, which, if reduced by contingencies beyond its control, then a *pro rata* distribution of its entire production among all with whom it had contracts should be regarded as full performance.

It was the custom of operators to make contracts for one and two year periods covering the reasonable normal capacity of their mines. At this point, appellee's invitation to bidders addressed to appellant may be of interest. That part of it now pertinent is as follows: "We wish to contract for our supply of fuel and will be pleased to receive a proposition from you for our requirements in Mine Run and regulation 1-1/4" screenings. Period: For a period of one or two years, commencing April 1, 1916. Requirements: Our requirements are approximately 300

tons per day, seven days per week, for the months of April, May, June, July, August, September, and October; 800 tons per day for the months of November, December, January, February and March." This invitation was dated February 23, 1916, and the above contract was dated April 1, 1916. This invitation, stating appellee's requirements at 300 and 800 tons per day was fixed as the probable quantity required by appellee for a period commencing April 1, 1916, and ending March 31, 1918. It appears that these estimated requirements were based upon appellee's coal consumption from April 1, 1915, to April 1, 1916, totaling 175,220.99 tons, or 9,779.01 tons less than the estimated requirements for each yearly period ending March 31, 1918. However this may be, the contract expressly fixed the quantity—appellee's entire requirements—of coal sold and purchased. The invitation to bidders furnished important information to the operator in determining the disposition of its probable coal production. This estimate totaled a yearly requirement of 185,000 tons, which according to appellant's figures show coal consumed by appellee (152,818 tons) for the year 1915, or 33,000 tons less than the yearly requirements for 1916 and 1917. These figures of appellant were taken from its books, showing the coal it had furnished appellee for the year 1915, and, on calling appellee's attention to them, the answer was that they intended by the invitation to bidders to call for enough (300 and 800 tons) to cover fully their anticipated consumption for the next two years. Comparing appellant's figures on actual consumption with the figures showing the tons actually consumed, tends strongly to prove that appellant did not furnish during the year 1915 appellee's entire requirements. From the evidence, we are led to believe that it was the purpose of appellee to cover its entire requirements by this contract, which it sought

MAY TERM, 1923.          431

Jackson Hill, etc., Co. *v.* Merchants Heat, etc., Co.—193 Ind. 422.

to make for the yearly periods of 1916 and 1917, and that appellant so understood it.  With this information at hand, the contract was prepared, which is presumed to embody the final negotiations of the parties.  It was the duty of the trial court, and the questions here presented on appeal make it the duty of this court, to determine the true meaning of the contract from the language employed by the parties to express their several obligations to each other.  If there is room for construction, the intention of the parties is always important, and for that purpose, the court may consider, in connection with the contract, the conditions and surroundings of the parties and the objects they had in view.  If these matters are not expressed in the contract, they may be shown by parol.  *Warrum* v. *White, Admr.* (1909), 171 Ind. 574; *Cool* v. *McDill* (1906), 38 Ind. App. 621.

If appellant's construction of the contract is to obtain, then the trial court erred in requiring appellant to answer appellee's interrogatories; also in giving and refusing to give to the jury certain instructions, and in admitting certain evidence. On the other hand, if appellee's interpretation of the contract is correct, then the trial court did not commit reversible error in any of these particulars.  The contract was for appellee's entire requirements for a certain period at stipulated prices, and therefore not void for uncertainty and want of mutuality.  *Burstein* v. *Phillips* (1913), 154 Wis. 591, 143 N. W. 679; *Walker Mfg. Co.* v. *Swift & Co.* (1912), 200 Fed. 529, 119 C. C. A. 27, 43 L. R. A. (N. S.) 730; *C. W. Hull Co.* v. *Westerfield* (1922), 107 Nebr. 705, 186 N. W. 992; *Minnesota Lumber Co.* v. *Whitebreast Coal Co.* (1895), 160 Ill. 85, 43 N. E. 774, 31 L. R. A. 529; *Scott* v. *T. W. Stevenson Co.* (1915), 130 Minn. 151, 153 N. W. 316; *Hickey* v. *O'Brien* (1900), 123 Mich. 611, 82 N. W. 241,

432    SUPREME COURT OF INDIANA,

Jackson Hill, etc., Co. *v.* Merchants Heat, etc., Co.—193 Ind. 422.

49 L. R. A. 594, 81 Am. St. 227; *American Hdw. Lumber Co.* v. *Dent* (1910), 151 Mo. App. 614, 132 S. W. 320; *Wells* v. *Alexandre* (1891), 130 N. Y. 642, 29 N. E. 142, 15 L. R. A. 218; *Storm* v. *Rosenthal* (1913), 156 App. Div. 544, 141 N. Y. Supp. 339; *Mebius & Drescher Co.* v. *Mills* (1907), 150 Cal. 229, 88 Pac. 917. In the case last cited, p. 236, we find language quite appropriate to the case at bar. "But here the maximum amount which the seller could be called upon to deliver, and the purchaser be called upon to take, was absolutely fixed, and it may not be said that, because a certain play of discretion as to quality was allowed within that limit, this discretion introduced an element of uncertainty which would invalidate the contract." Coal, as it comes from the mine, is known as "mine run", and from which prepared coal and screenings are produced. Prepared coal includes everything except screenings and mine run, and screenings are obtained by passing the mine run over bars having 1-1/4″ openings and shaker screens. Appellant's mine run coal produced about sixty-one per cent. prepared coal and thirty-nine per cent. screenings. The price was fixed at $.85 per ton for screenings and $1.10 per ton for mine run, but, if more than thirty per cent. of appellee's entire requirements was furnished in mine run, then the price of such excess was fixed at the rate of $1.00 per ton. These prices, when considered in connection with appellant's production of sixty-one per cent. prepared coal and thirty-nine per cent screenings, and its agreement to furnish seventy per cent. and thirty per cent., are quite supportive of the thought of appellant's anxiety to obtain the contract as well as appellee's desire for screenings. These figures also furnish the basis for the argument that this was a screenings contract.

Appellant insists that appellee was under no obliga-

tion under the contract to take any particular quantity of either mine run or screenings, nor was appellant bound to furnish any particular quantity of either. Hence there was a lack of mutuality of obligation. It cites and relies upon *Oakland Motor Car Co.* v. *Indiana Automobile Co.* (1912), 201 Fed. 499, 121 C. C. A. 319. This case is readily distinguishable from the instant case, in that, in the Oakland case, the dealer agreed to purchase fifty cars from the manufacturer, then engaged in manufacturing several models of two-cylinder and four-cylinder cars. The contract did not specify any of the models which the purchaser might select for delivery, but did require, as said by the court, p. 504, that—"an order be sent in for each intended purchase, specifying the kind of cars desired, and providing that the manufacturer was not bound for sale thereof without his acceptance for that purpose as described. Thus the plaintiff's agreement to purchase 50 cars during the term was expressly made unilateral, through this stipulation (in effect) that the defendant was at liberty either to accept or refuse compliance with any tender of purchase thereunder, leaving no basis for implying a promise on the part of the defendant to sell the 50 cars, and no liability for refusal to make further sales to the plaintiff." The contract here was one they had a right to make. It was not unilateral, as both parties were obligated, one to furnish and the other to receive a quantity certain of coal. It contained no provision authorizing appellee to reject mine run or screenings in any amount within the limitation—entire requirements —called for by the contract. The selection of the particular kinds of coal was left to appellant, and, keeping in mind the situation and surrounding circumstances of the parties at the time the contract was entered into, it is evident they intended to make it, as to quantity and

kind, as definite as possible. Hence, we hold that appellant was in duty bound to furnish the contract quantity either in screenings, mine run, or both.

Appellant complains of instructions Nos. 2, 3, 8, 9, 10, 11, 12, 13, 14, 15, 17, 18, 20, 21, 22, 29, 32, 34 and 35, and in refusing to give instructions Nos. 1, 4 and 8

5. tendered by appellant. Appellant asserts that instruction No. 2, given by the court on its own motion, was erroneous in that it prescribed the wrong rule for the burden of proof. The point made against the instruction is that it placed the burden on appellant to prove the material allegations of each paragraph of its answer to defendant's counterclaim, when one of its answers was a general denial. This instruction first referred to each of plaintiff's affirmative pleadings, and told the jury that the burden was upon plaintiff to prove the material allegations of each paragraph thereof, and of each paragraph of its answer to defendant's counterclaim by like proof. The jury could not have inferred that plaintiff must disprove appellee's affirmatives, for it was expressly told in this same instruction that the burden of proof was upon the defendant to prove the material allegations of each of its various affirmative pleadings by a fair preponderance of the evidence, and explaining properly what was meant by the expression "a fair preponderance of the evidence." While conceding that the instruction might be technically construed as appellant suggests, and therefore not strictly accurate, yet we would hesitate to say that a jury of ordinary intelligence would be misled into giving the instruction the interpretation placed upon it by appellant.

Our conclusion as to the meaning of the contract is not different from that of the trial court, as evi-

6. denced by instructions Nos. 3, 11, 20, 21, 22 and 29, given to the jury upon its own motion. Ap-

Jackson Hill, etc., Co. *v.* Merchants Heat, etc., Co.—193 Ind. 422.

lant asserts that these instructions are erroneous, first, because they place a wrong construction upon the contract, and, second, that they require an apportionment of appellant's entire production irrespective of quantities which it could not reasonably be expected to apportion. These instructions were not faulty because of either of the above objections. In the first place, they put a proper construction upon the contract, and, in the second place, it appears from the undisputed evidence that appellant's entire production, except that used under its own boilers, was for disposition to its customers, and that it so disposed of the same. On the question of apportionment, the court, in substance, told the jury that it was the duty of appellant to so apportion its entire output as to give to all contract customers substantially the same proportion of their contract obligations. It is true appellant used many tons of coal under its own boilers, which was necessary to production. It is also true that during a period commencing October 1, 1917, it furnished the state and federal governments, on orders, 30,914 tons, which was not contract coal. But its compliance or noncompliance with these orders was not a matter within its discretion or control, and consequently these conditions were taken care of by the instructions, which apportioned the production among contract customers when necessary by reason of strikes, combinations of miners and laborers, lockouts, accidents and causes beyond its control.

Instructions Nos. 8 and 34 are challenged on the ground that they required proof that appellee knew why the twenty-five cent and forty-five cent advances were made in the contract prices of coal, and that instruction No. 17 was erroneous for the reason it prevented the jury from finding an implied agreement to pay the twenty-five cent and forty-

five cent additional charges outside the written contract. These instructions, in effect, advised the jury that good-faith advances in the wages of miners by appellant in order to avoid strikes were increases in the cost of production and might properly be added to the contract price. From the evidence, we learn that the miners' wage scale was increased twenty-five cents per ton, effective April 16, 1917, and on November 1, 1917, another wage scale increase of forty-cents per ton was adopted, and these wage advances were added to the contract prices and included in the invoices for coal shipped to appellee. At the time appellant brought this action, it may be conceded that, in the absence of credits for costs of coal to appellee over the contract price, there was due appellant from appellee the sum of $112,055.37, but, by allowing the credits claimed by appellee in its counterclaims and set-offs, other than the twenty-five cents and forty-five cents advance charges, there was due appellee from appellant $58,251.55. The jury gave appellee a verdict against appellant for $58,000. Consequently, the instructions now under consideration, and any evidence pertaining to these two advance charges, even if erroneous, did not harm appellant, and hence the court's action in admitting or rejecting evidence as to either of these items, or in the giving of these instructions, was not reversible error.

The objections urged to instructions Nos. 9 and 10 are that: "they injected into the case, without warrant, the question of fraud and misrepresentation on appellant's part, no such issue being raised by the pleadings or proof; and mis-stated the rule on what constitutes an involuntary payment." Instruction No. 9 had reference to an oral contract entered into between appellant and appellee whereby appellant was to purchase in the open market, for appellee's ac-

MAY TERM, 1923.            437

Jackson Hill, etc., Co. *v.* Merchants Heat, etc., Co.—193 Ind. 422.

count, coal at current prices, and the jury, in effect, was told that the written contract existing between the parties would not interfere with their making a valid and binding oral agreement "unless it was induced by fraud or false representation on the part of the plaintiff." Appellee's second paragraph of answer to the original complaint averred that it purchased from appellant, and fully paid for, certain coal, at the market price, to meet emergencies. And, except as to the emergency coal, all shipments of coal by appellant to appellee were under and pursuant to the terms of the written contract, and that appellant furnished and billed to appellee coal at a price in excess of the written contract amounting in the aggregate to nearly $100,-000. Appellant, replying to this answer averring excessive payments over the contract price, in substance, alleged that during the period from January 1 to April 7, 1917, plaintiff, by agreement, purchased for and furnished the defendant, at current market prices, quantities of coal of different kinds from other parties, in excess of that produced by the plaintiff's own mines, of a large value, and for which there is a balance due of $55,612.37 and unpaid, and is the amount sued for in the second paragraph of the complaint. A rejoinder is unknown to our practice, hence we may look to the evidence to meet these allegations of reply. An examination of the record discloses much evidence tending to prove that, at the time this oral agreement was entered into, appellant represented that it was giving to appellee all the coal reasonably apportioned to it under the written contract, and that these representations were not true; that it was under those circumstances that appellee bought, through appellant, on the open market, a large quantity of coal. We are satisfied the issue and the evidence, to which we have referred briefly, justified the court in giving instruction No. 9.

438    SUPREME COURT OF INDIANA,

Jackson Hill, etc., Co. *v.* Merchants Heat, etc., Co.—193 Ind. 422.

In view of the evidence and verdict, to which we have already called attention, the voluntary or involuntary payment clause of twenty-five cents and forty-five cents advances mentioned in instruction No. 10 was not harmful to appellant. Instructions Nos. 12 and 13 also involve the law of voluntary and involuntary payments, and are not objectionable.

Appellant insists that instruction No. 14 invaded the province of the jury by telling it that certain stated facts and acts of defendant would not justify it in finding an estoppel against appellee in making payments of excessive prices. The instruction follows: "The fact, if it be a fact, that the plaintiff sent postal card notices to the defendant, showing shipments of so-called purchased coal, and the further fact, if it be a fact, that the defendant made payment of the amounts of specific invoices of such purchased coal, is not sufficient to estop the defendant from now asserting that the plaintiff was bound under its contract to have delivered such coal, or the amount thereof, to the defendant under the contract, and to have charged for it at the contract price. Neither is the fact, if it be a fact, that after April 8, 1917, the plaintiff invoiced coal delivered to the plaintiff at twenty-five cents in excess of the contract price, and at a latter date invoiced coal to the defendant at seventy cents per ton in excess of the contract price, and that the defendant paid such invoices at such increased prices, sufficient to estop the defendant from now asserting that it did not agree to pay such increased prices." We see no objection to this instruction.

Instructions Nos. 15 and 32 may be considered together, as the same objection is urged to both. It is claimed that these instructions permitted appellee to recover on the basis of its alleged loss in making up its entire requirements from pur-

chases outside the written contract, instead of limiting such basis to the quantities of coal so purchased by appellee to complete the amount to which it would have been entitled from appellant under a fair apportionment. Instruction No. 15 merely told the jury that if, during the period covered by the written contract, the plaintiff notified the defendant that, due to car shortage or labor shortage, it would be unable to furnish the defendant with its entire fuel requirements, and the defendant had no knowledge or information to the contrary, then the defendant was justified in acting upon such notice and in purchasing additional coal in sufficient quantities to meet its requirements, either by purchasing it from outside parties, or by authorizing the plaintiff or its agent to purchase such additional coal for the defendant without thereby waiving any right of action which it might have against the plaintiff for wrongfully failing to furnish coal under the contract. A further objection is urged to instruction No. 32, in that it allowed the jury, in estimating damages, to take the market price of coal purchased by appellee in place of that which appellant did not deliver, and deduct therefrom the contract price of appellee's just proportion of appellant's output. This contention is not well taken. This instruction, when read in connection with others given, permitted a recovery of the "difference between what the coal which should have been delivered under the contract would have cost at the contract price and the actual cost of the coal purchased in good faith for use in place of what the seller failed to deliver, but not in excess of the fair market price at the time of such purchase." It is conceded that appellant did not furnish to appellee its coal requirements. By reference to the facts, which are practically undisputed, it appears that appellant's failure to supply appellee's requirements for coal began with the month

of November, 1916. For that month, the figures show that appellant's coal production available for sale was 80.7 per cent. of all of its contracts, which would entitle appellee to 16,046 tons, of which it furnished 11,804 tons, or 4,242 tons less than was due appellee under a fair apportionment, and 8,080 tons less than appellee consumed. However, for that month, it appears that appellant furnished to noncontract customers 507 tons of screenings, 636 tons of mine run, and 20,733 tons of prepared coal. These figures would indicate that appellant was diverting its coal production from contract customers to noncontract customers. Without taking the space to set out the figures for the remaining months of the contract, this same neglect to furnish appellee's requirements, or its fair proportion of coal under its contract, continued, except in the month of August, 1917, when it received from appellant 1,830 tons more than its requirements. During the months of May, June, July, August, September, October, November and December, 1917, appellant's coal production was largely in excess of its contract requirements. However, during that period, and, in fact, the contract period from November 1, 1916, appellant furnished large quantities of coal each month, screenings, mine run and prepared, to its noncontract customers. Appellant accounts for a portion of the coal sold to noncontract users as "free coal", arising out of the failure of certain of its contract purchasers to take their allotments, which it treated as free coal for sale generally. It also appears that at about the time of appellant's claim of inability to comply with its contracts, the prices of coal had advanced materially over the prices at which it had made contracts early in the year 1916.

Appellant insists that instruction No. 18, eliminating the President's Proclamation of October 27, 1917, from

Jackson Hill, etc., Co. *v.* Merchants Heat, etc., Co.—193 Ind. 422.

the consideration of the jury, was harmful to it, and therefore erroneous. The President's Proclamation, authorizing an increased price of forty-five cents per ton for coal at the mine, was not admitted in evidence; but, as we have seen, on the demand of the miners, the increase of forty-five cents was allowed, and appellant given the benefit of that increase. Hence, it was not harmed by the refusal to admit in evidence the President's Proclamation, nor was it error to give the instruction to the effect that such proclamation did not change the relation of these parties to the written contract.

We have examined instruction No. 35, and have reached the conclusion that no reversible error intervened in so instructing the jury.

Appellant's requested instructions Nos. 1, 4 and 8 had reference to a construction of the written contract, and were properly refused.

It is next insisted that the amount of recovery was too large, also that the verdict of the jury was not sustained by sufficient evidence, and therefore contrary to law. Neither of these insistences can be sustained, for the reason that the evidence, under our theory of the contract, is abundantly sufficient to sustain the verdict of the jury.

Judgment affirmed.

Townsend, J., absent.

Ewbank, J., not participating.